Filed 5/3/13  Marriage of Nigro CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of ELIZABETH A. and THOMAS R. NIGRO. | |
| ELIZABETH A. NIGRO,  Appellant,  v.  THOMAS R. NIGRO,  Respondent. | G046170  (Super. Ct. No. 01D003588)  O P I N I O N |

Appeal from postjudgment orders of the Superior Court of Orange County, David L. Belz, Judge.  Dismissed in part and Affirmed in part.

Merritt L. McKeon for Appellant.

Law Offices of Thomas R. Nigro and Thomas R. Nigro in pro. per.

Elizabeth and Thomas Nigro[1] divorced in 2005, but they returned to family court due to their difficulties agreeing on the best course of action for their 15-year old daughter Alexandra (Alex).  After speaking privately with Alex, the court ordered Thomas to organize and facilitate a double-blind study to determine whether Alex is still suffering from Attention Deficit Hyper-Activity Disorder (ADHD), and if so, the correct dosage of Adderall she should be taking to treat the symptoms.  To insure this non-invasive diagnostic test would be completed, the court modified the parents' joint legal custody order, and it temporarily modified their physical custody arrangement.  Due to evidence Elizabeth had violated prior court orders and interfered with past efforts to correctly diagnose Alex, the court determined there had been a sufficient change of circumstances warranting an order giving Thomas sole legal custody over medical decisions relating to only Alex's ADHD assessment and treatment.  It also temporarily modified physical custody for the duration of the 30-day double-blind study.  The family law court sanctioned Elizabeth under Family Code section 271[2] because her sabotage of the earlier court-ordered diagnostic testing frustrated the policy of the law to promote settlement and resolution of issues.  The court also denied Elizabeth's motion for need-based attorney fees under section 2030.  Elizabeth's challenges to these postjudgment orders lack merit, and we affirm the orders.  In light of our ruling affirming the final orders, we dismiss Elizabeth's appeal asking this court to reverse the trial court's interim order of October 7, 2011, that denied her request to modify a tentative decision.

---

[1]    "As is customary in family law proceedings, we refer to the parties by their first names for purposes of clarity and not out of disrespect.  [Citations.]"  (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1.)

[2]    All further statutory references are to the Family Code, unless otherwise indicated.

I

In May 2002, Elizabeth and Thomas, both attorneys, separated after nearly 14 years of marriage and when their only daughter, Alex, was four years old. A stipulated judgment filed in 2005, awarded the parents joint custody of their daughter, with primary physical custody given to Elizabeth.

In July 2002, Elizabeth took Alex to see a therapist, Zena Polly, Ph.D. In May 2003, Alex's pediatrician, Aldon Clark, prescribed Adderall for then five-year-old Alex to treat symptoms of ADHD.

Based on Elizabeth's reports to the pediatrician, Clark refilled the Adderall prescription over the next 9 years (2003-2009), and gradually increased the dosages (from 5 milligrams when Alex was 5 years old, to 30 milligrams when she was a teenager). On May 20, 2009, Elizabeth reported to Clark that Alex's grades had dropped and she sought another increase in the Adderall dosage. At the time Alex was 11 years old and in the sixth grade.

A few days later, Elizabeth filed an ex parte application for an order to show cause (OSC) to eliminate Thomas's mid-week visitation. Elizabeth explained that due to Alex's extracurricular activities as a competitive dancer (involving 7 to 10 dance classes per week), Thomas's visitation schedule had already been modified. Although he visited Alex on Wednesdays, Thomas had agreed for the past year to waive his Tuesday overnight visits "as they were too short and stressful with Alex's school schedule." Elizabeth filed the OSC because Thomas was demanding "previously unused visitation time" and Elizabeth was exhausted having to keep up with Alex's school work and dance commitments. Elizabeth added Alex had been an excellent student in the Gifted And Talented Education (GATE) program at her middle school, but she had recently fallen behind on her school work and her grades were suffering.

Elizabeth stated Thomas unfairly complained Alex was overscheduled. Elizabeth blamed Alex's drop in grades on Thomas's "recent lifestyle change" and

3

"unwillingness to comply with longstanding agreements regarding" his daughter's care. Elizabeth declared Thomas's "lifestyle change" related to his relationship with his girlfriend, Angela Weldon, and Weldon's daughter. Alex was now spending weekends at Weldon's home. Elizabeth stated Alex was stressed about living in three different houses, and she was having difficulty keeping track of her school books and other items when transitioning between her mother's house, father's house, and his girlfriend's house. The stress of this living arrangement was contributing to Alex's recent poor grades. In addition, Elizabeth claimed Thomas frequently failed to give Alex her ADHD medication and he was unreasonably requesting she be retested. Elizabeth did not mention in her OSC the fact that she had recently sought an increase in Adderall to address Alex's falling grades. In the OSC, she blamed Thomas.

Elizabeth also complained about Thomas's behavior towards her. She said he was requesting Tuesday overnight visits and this change required them to have almost daily contact to make the necessary arrangements. Elizabeth declared the exchanges were stressful and often confrontational. Thomas also requested to start picking up Alex on Wednesday and Elizabeth was concerned he would not be able to handle the preparations necessary for Alex's upcoming weekend dance competition. She stated, "He has no idea how to put on her makeup, or what costumes or accessories are required. Dads are not allowed in the girls' dressing room."

Elizabeth concluded the current mid-week visitation schedule was "interfering" with her ability to earn a living because she had to constantly interact with Thomas to make sure Alex had what she needed to succeed in school. Elizabeth stated her struggles were interfering with her relationship with Alex, who did not understand the problems and liked spending time with Weldon and her daughter. Elizabeth requested the court eliminate Thomas's mid-week visits and that in exchange he be given additional time during the summer.

4

Thomas opposed the OSC, stating there was no emergency grounds to warrant an ex parte application, and he asked the court to order a section 730 evaluation (hereafter 730 evaluation) to determine Alex's best interests and if she should live full time with him. Thomas also stated Elizabeth was overmedicating Alex without having a proper diagnosis, she was constantly changing the amount of medication, and she had bullied the pediatrician into issuing prescriptions. Thomas stated Elizabeth clearly disapproved of his lifestyle and she was trying to alienate him from his daughter. Thomas expressed concern about Elizabeth's insistence on medicating Alex. He stated the drug was originally prescribed based on the finding of a psychologist (Polly), who determined then five-year-old Alex had some ADHD symptoms. Thomas stated Elizabeth's accusation that he refused to give Alex her medication was false, and he believed Alex's academic struggles were likely due to a variety of factors, and not just his "lifestyle."

The following month (June 2009), Elizabeth filed a motion to compel Weldon's deposition. Several days later, Thomas filed an OSC requesting a full custody evaluation to determine Alex's best interest, a 730 evaluation, and a medical evaluation regarding ADHD and Alex's need for medication, a change in Alex's primary care physician, and an order stating Alex's ADHD medication could not be modified unilaterally by Elizabeth without Thomas's consent. Thomas also filed a protective order for Weldon. He stated Elizabeth sought to depose his girlfriend on the grounds she was a "percipient witness relative to custody and visitation" issue, but in reality the deposition was being improperly used to force a dialog between the two women. He explained Weldon had refused to informally speak to Elizabeth about Alex's ADHD medication. He complained that in addition to the harassing deposition subpoena, Elizabeth was making threats to restrict visitation and obtain a restraining order.

In July 2009, Commissioner Richard G. Vogl ordered a 730 evaluation regarding "the disputed visitation issues, with a special focus on the ADHD, and the other

5

special needs [of the child]." The parties participated in mediation and agreed to a temporary modified parenting plan. They agreed to alternate custody of Alex for one week at a time during the summer. They also agreed to have Alex's ADHD diagnosis reassessed and to have Alex participate in therapy.

In August 2009, Alex underwent four days of diagnostic testing at University of California, Irvine's (UCI's) Neuropsychology Laboratory. In October 2009, Sabrina E. B. Schuck, Ph.D., and Francis M. Crinella, Ph.D., prepared a report of their findings. They concluded Alex would benefit from educational therapy (designed to help her improve her skills in processing speed and memory), academic support (modifying the amount of work and allowing Alex to use a keyboard for written work), and individual therapy. They recommended a therapist trained in family systems, citing the "considerable amount of tension and stress between Alex's parents over [her] custody and care . . . . It seems that this stress is resulting in increasingly emotional, even explosive behavior . . . ." And finally, the doctors highly recommended a double-blind medication trial. They explained Alex seemed to perform better on most tasks while taking medication and she believed the medication helped her. They opined, "It is unclear how strong a placebo effect may be influencing her responses to medication. Additionally, some of her performances were so drastically different on medication; it seems highly unlikely that the poor performance on the initial assessments was due solely to the absence of medication."

In December 2009, Alex's pediatrician, Clark, increased Alex's dosage of Adderall from 30 to 35 milligrams. Clark was unaware of the report issued by the doctors at UCI. Thomas was not told about the increased dosage.

On April 19, 2010, the court ordered a double-blind study pursuant to the recommendation of UCI and the parties' stipulation on the issue. Both parties were ordered to cooperate with the medication protocol.

6

Alex agreed to participate in a double-blind study starting on May 20, 2010, and ending on June 19, 2010, just prior to the end of the school year. The study was designed to include teacher ratings, because that would make the study more reliable. Before the study began, UCI asked Elizabeth what dosage of medication Alex was taking. She falsely reported 30 milligrams. UCI provided a 30 day medication tray along with a log sheet. The medication tray contained placebo pills, 20 milligram pills and 30 milligram pills, randomly placed in separately dated and sealed compartments. Each compartment was dated to correspond with each day of the study. Only UCI knew what dosage was contained in each compartment. Alex, her parents, and her teachers, were asked to rate Alex's behavior over the one month period, and then UCI would compare the ratings and determine if medication was helpful and the correct dosage.

Alex was with Thomas for the first day of the study (May 20). On the second day she was with Elizabeth. By the third day (May 22), Elizabeth had stopped participating in the study. Elizabeth gave Alex the regular dose of Adderall. She alleged Alex "begged" for her pill.

Two days later, on Monday, May 24, 2010, Elizabeth sent an e-mail to UCI stating Alex refused to take the study pill. She wrote Friday was a bad day because Alex forgot to turn in homework and she was worried about doing badly in school because of the double-blind study. Elizabeth said the next morning they were leaving to go to a dance competition in Riverside. Elizabeth offered Alex the study pill and she gave it back, saying she did not want to jeopardize her dancing at the competition after feeling so bad on Friday. Elizabeth said she gave Alex her regular medication because she begged for it. Alex said she felt better after one hour and she did not want to take the test tray medication again. Elizabeth said she tried "one last time" on Monday morning (May 24) to give Alex the study pill. She wrote, "[Alex] shook her head and gave it back to me."

On May 25, Elizabeth wrote another e-mail to UCI stating the double-blind study was ordered by mutual agreement. She asserted Judge David Belz, who made the

7

recommendation, was biased. Elizabeth stated she was more concerned than Thomas about Alex's emotional well being, and because the medication was not dangerous, Alex should continue taking the pills.

Alex returned to Thomas's custody on May 27, and Alex agreed to resume the study. However, Elizabeth refused to give Thomas the medication tray. Thereafter, UCI cancelled the double-blind study because there was insufficient time to complete it before the end of the school year.

On May 28, Thomas obtained a copy of Clark's medical records and learned for the first time Elizabeth had obtained an increased dosage of 35 milligrams for Alex. In the records, Thomas saw Elizabeth had failed to tell Clark about the UCI recommendations or the failed double-blind study.

Elizabeth sent another e-mail to UCI on June 2 in response to a suggestion they resume the study. Elizabeth stated the study would have no value in the summer because Alex's only activity was dance, which she was passionate about and had no trouble focusing on. Elizabeth said she would refuse to consent to a study in the summer, or when school started again because the 8th grade "is very important as to high school placement."

At the end of June 2010, Thomas filed an OSC requesting sole legal custody to make medical decisions. He asserted modification was warranted due to the change of circumstances regarding Elizabeth's interference and sabotage of the double-blind study. He also requested sanctions pursuant to section 271 for the costs incurred in redoing the double-blind study and to litigate the OSC.

Thomas filed a declaration stating he obtained the medical records from Alex's pediatrician, Clark, and the psychologist Alex saw when she was five years old, Polly. The records show Elizabeth asked Clark to increase Alex's dosage of Adderall without Thomas's knowledge or consent. In addition, Polly's records indicate Alex never met the criteria for an ADHD diagnosis, and Clark prescribed Adderall without a

8

complete clinical diagnosis from Polly. Thomas asserted Alex was taking Adderall three months before Polly administered a short version of the WISC-3 (Wechsler Intelligence Scale for Children) and diagnosed Alex of showing "mild ADHD." Thomas presented evidence showing Elizabeth has always been resistant to an ADHD reevaluation. Thomas stated six months after UCI recommended the double-blind testing, Elizabeth finally agreed to sign a stipulation for the reevaluation, and the trial court ordered the test. Because Alex only participated in the study for four days, UCI issued a report stating the results were inconclusive and the doctors strongly recommended another double-blind study because the results indicated the possibility of a placebo effect. Thomas stated Elizabeth was not concerned over the inconclusive results and was falsely telling Alex and the 730 evaluator that UCI confirmed the ADHD diagnosis.

Thomas concluded that despite being ordered by the court to fully cooperate with the testing, Elizabeth made "every aspect of putting the double-blind study in place as cumbersome and difficult as possible, projecting her negativity and criticism of the process to myself, UCI and most importantly, [Alex], supporting, empowering and encouraging [Alex's] reluctance and resistance." He offered several examples. First, Elizabeth argued at length with Thomas over which teachers and individuals would be asked to rate Alex during the study. Second, Elizabeth did not want to personally ask Alex's teachers to participate in the study. Thomas spoke with Alex's teachers, and they agreed to participate. Third, Elizabeth unilaterally stopped the study after just a few days and waited three days to tell UCI or Thomas. Fourth, Elizabeth refused to give Thomas the medication tray when Thomas wanted to resume the study.

In addition, Thomas advised the court that Elizabeth disclosed the contents of Alex's confidential 730 evaluation to the UCI team because she hoped it would cause them to withdraw their recommendation to reschedule the double-bind test. Elizabeth also told the UCI team the trial court was biased. Elizabeth concealed an increase in

9

Alex's medication from Thomas and UCI. She asked Alex to keep the dosage a secret, and she hid the insurance co-payments for the increased dosage from Thomas.

Thomas concluded by noting Elizabeth had violated the trial court's June 19, 2009, order by concealing the increase in Alex's medication and by failing to cooperate with the court ordered double-blind study. In addition, Thomas asserted Elizabeth violated the court's July 17, 2009, order and sections 3052.5 and 3111 by her unauthorized disclosure of the contents of the 730 evaluation. Thomas noted Elizabeth had announced she would not agree or consent to any further testing, and he was seeking ex parte relief to re-institute the double-blind study without her interference at the beginning of Alex's 2010-2011 school year.

Moreover, Thomas believed Elizabeth's acts of concealing Alex's increased dosage from UCI and Thomas demonstrated "an alarming disregard for [Alex's] health and well being as well as [the trial c]ourt's orders." Thomas requested the court award him legal custody for the purposes of making medical decisions for Alex, for resumed testing in the beginning of the school year, and for ensuring no medication be administered while school is not in session. Thomas also requested section 271 sanctions due to Elizabeth's obstreperous conduct and her sabotage and interference with the double-blind study, costing Thomas $4,150 in expenses for the aborted double-blind study.

At the hearing, the court considered testimony from the parents and Clark. It also considered the deposition transcript of Kenneth Steinhoff, the psychologist at UCI who headed the double-blind study. In his deposition, Steinhoff declared a double-blind study would help determine Alex's best dosage, because the dosage is not determined by weight or by the severity of the ADHD. He stated UCI wanted to find the best dosage to give Alex optimum symptom improvement. Steinhoff declared the purpose of the double-blind study was to determine if Alex needs medication and to determine the best dose, because the wrong dose could negatively impact her best interests due to the

10

medication's side effects. Steinhoff opined the test results from the neuropsyche report did not establish the presence of ADHD. He explained children are diagnosed based on the DSM-IV,[3] and the American Academy of Pediatrics has clinical practice guidelines for the diagnosis and evaluation of children with ADHD. Steinhoff stated there are three subtypes of ADHD according to the DSM-IV, and diagnosis requires careful consideration. Sometimes, other disorders such as anxiety can look like ADHD. Steinhoff would never recommend starting medication for ADHD before an evaluation was performed.

Steinhoff concluded the best way to determine the efficacy of the medication was to undergo a double-blind study. He added the study requires evidence directly from the classroom teachers regarding symptoms because the child is in school five to seven hours per day and it is the best place to spot behavior symptoms such as inattention, hyperactivity, and impulsivity. Steinhoff stated UCI created a double-blind study based on three dosages for 28 days. He stated it was better to have more people observing and rating Alex's behavior to provide more data. UCI picked the doses of zero (the placebo), 20 milligrams, and 30 milligrams because that was the highest dosage he was told she was taking. He noted it was important to know the dosage the child was on at the time of the study to give an estimate of a benefit and starting point.

Steinhoff represented UCI was unaware Elizabeth increased Alex's dose to 35 milligrams, and this change in dosage would have caused an error in the study. Steinhoff explained that not knowing the right dosage might make UCI think Alex was not deriving as much benefit from the medication and interfere with the determination of her best dose. Steinhoff stated UCI learned about the increase dose from Thomas after the double-blind study was commenced.

At the hearing, Thomas presented more details about the failed

_____

[3] Diagnostic and Statistical Manual of Mental Health Disorders, Fourth Edition.

11

double-blind study and Elizabeth's interference. Thomas submitted evidence the medication tray was still sealed for the Monday May 24th pill dosage, but Elizabeth's e-mail to UCI misrepresented she physically handed Alex the study pill that day. Thomas also impeached Elizabeth's claim Alex had a bad day on the first day of the study because she forgot to turn in a social studies assignment. Thomas presented Alex's progress report card showing the assignment was turned in on time and she received an A+ for her work.

After considering arguments from both sides, the court stated it had met with Alex in chambers and they had a very "frank and straightforward" conversation. The court said it asked Alex about her concerns with the double-blind study and she had shared her concerns about starting a new school and about what her friends may say if she started acting funny. The court told the parents these were normal concerns but inadequate reasons not to get a proper diagnosis. The court noted Alex "thinks she needs the medication" but it was unclear if she actually needs it and the court was surprised Clark admitted he prescribed a controlled substance to a five-year-old child without having a firm diagnosis or even a follow-up diagnosis. The court stated that based on Elizabeth's demeanor and testimony, the court believed she was "really committed to the use of this medicine." The court added it disagreed with Elizabeth's argument Alex should have the sole choice on this issue because there is no legal basis to allow a minor to make a decision on the use of a controlled substance. The court concluded the changed circumstance warranting modification of custody were the facts surrounding why the court-ordered study was not completed and how Elizabeth interfered with it. The court concluded the parties could not proceed forward with a second study under the same custody arrangement.

The court mentioned it had considered the fact Alex was starting at a new school, and Alex thought the double-blind study may interfere with her grades. The court stated the best way to handle that issue was to let the doctors assist Alex, and because her

12

teachers were going to be involved in the 30-day study, they would understand if there was a dip in her grades.

Elizabeth argued there was no evidence she did not want the study and there was no way to force Alex to cooperate with the test. The court replied Alex had stated in chambers she would cooperate with the test. When Elizabeth questioned this statement, the court reiterated, "I talked to her about her feelings . . . [and] she's concerned about . . . acting a little bit different" and about how she will be perceived by her friends. The court had assured Alex there were four years of high school and although the court wished the study had been completed last year, this was the right time to let the doctors help and weigh in on the issue.

Before issuing a lengthy statement of decision, the court issued a tentative decision indicating Thomas would be awarded sole legal custody and physical custody during the time required for a new double-blind study. Thereafter, on October 7, 2011, Elizabeth filed an ex parte application requesting emergency modification of the tentative decision. Specifically, she requested a court order to require Thomas to take Alex to dance and school activities and for Thomas to give Alex Adderall during custodial time. Elizabeth also sought an updated child custody evaluation, a new child therapist, and for modification of the tentative order requiring another double-blind study. Elizabeth stated she asked Thomas to consider changing Alex's medication from Adderall to Vyvanse, which is a similar stimulant medication but less likely to cause anxiety. Elizabeth stated Alex was suffering from extreme anxiety and emotional outbursts. For example, Alex had recently threatened to kill herself by opening a car door while the vehicle was moving. The trial court denied Elizabeth's ex parte application to modify the tentative decision.

A few days later, on October 11, 2011, the court issued a lengthy statement of decision, making the following factual and legal findings: (1) no baseline was ever

13

established at any time for the need, use, or efficacy of Adderall for Alex; (2) Elizabeth interfered with the double-blind study in violation of the April 19, 2010, order; and (3) the court found there was "a sufficient change in circumstances and legal justification to give [Thomas] sole decision making authority regarding all matters relating to the double-blind study, the doctors to be involved and implementation of medication or a different protocol if necessary for the continued use of Adderall for [Alex]." In addition, on the issue of credibility, the court found Thomas's testimony to be more credible than Elizabeth's testimony.

The court stated it based the above findings on the "expert" testimony of Clark and Steinhoff. It summarized the relevant testimony of Clark as follows: Clark could not confirm an ADHD diagnosis was ever made. He never spoke to Polly and did not review any records before he administered Adderall to Alex. Clark confirmed he relied solely on Elizabeth's reporting of Alex's behavior. Clark's testimony supported the conclusion no baseline for the use of Adderall was ever established.

The court noted it found relevant Steinhoff's testimony a double-blind study would determine Alex's "'best dose' which could be a placebo (zero)" and finding the best dose is in Alex's best interest. Steinhoff testified the wrong dose could negatively impact Alex's best interest and Steinhoff was unaware Elizabeth increased Alex's dosage to 35 milligrams. Steinhoff stated it was important to know the child's actual dose to conduct a reliable double-blind study. An incorrect dosage would create an error in determining the correct dosage. Steinhoff opined if it was determined medication did not help Alex, he would recommend stopping the medication.

The court also considered Thomas's request to change Alex's primary care physician. It authorized Thomas to discharge Clark and find a new physician for Alex. The court determined section 6924, regarding a child's ability to seek mental health treatment without parental consent, was inapplicable in this case.

14

As for the request for section 271 sanctions, the court determined $8,524.88 in sanctions (payable in monthly installments of $300) was warranted. After reviewing Elizabeth's income and expense declaration and her testimony, the court concluded sanctions would not create an unreasonable financial burden on her. The court reasoned "the evidence supports a finding that [Elizabeth] interfered with the double-blind study and therefore engaged in conduct that frustrated the policy of the law to promote settlement and resolution of issues."

The court made the following final orders: (1) Elizabeth must pay the sanction award; (2) a double-blind study will be conducted; (3) that Thomas have sole "decision making authority regarding all issues relating to the double-blind study, assessment and/or other matters and details relating to any ADHD reassessment or study, including the authority to select all physicians connected with the study, determine the participation of the parents in the study and/or assessment and select a new physician to provide any narcotic or controlled substance, if found medically necessary, for any ADHD condition; to monitor and control any prescribed narcotic, if necessary, including Adderall, or any other narcotic or controlled substance and to monitor and control compliance with physicians orders and recommendations whether it is to discontinue or lower the narcotic or controlled substance or monitor in a different manner"; (4) that Thomas have "sole authority to contact the doctors regarding all issues relating or pertaining to the double-blind study, assessment and/or other matters and details regarding any ADHD reassessment or study and/or narcotic or controlled substance, if medically necessary, and that neither [Elizabeth] or her attorneys or agents may contact the doctors, clinicians or health care providers without the knowledge and written consent of [Thomas];" (5) Thomas "shall have the authority to decide whether visitation and physical custody shall be changed in order that the minor is in [his] sole physical custody for the 30 day period during the double-blind study. In the event the minor is in [Thomas's] custody for 30 days, he will provide transportation to and from school";

15

(6) Thomas shall select a new pediatrician for Alex; (7) the parties are prohibited from "doing anything to discourage the minor from participating or completing the double-blind study or any other assessment for ADHD, including engaging in any act or behavior or imparting any negative or derogatory comment, discussion or commentary that would interfere or impede the reassessment or study"; and (8) the parities shall equally share in future costs and expenses for the double-blind study and any other treatment recommended by the doctors relating to ADHD.

On November 17, 2011, the court ruled on Elizabeth's request for need-based attorney fees and costs under section 2030. Although she was a certified family law specialist and primarily represented herself in the case, Elizabeth stated it was reasonably necessary for her to hire counsel to assist her. Elizabeth claimed she hired Merritt McKeon, an experienced family law attorney, who was "highly skilled in the unfamiliar area of appellate law." Elizabeth asserted Thomas had the ability to pay $19,704 for McKeon's services and $2,375 in costs.

The court issued a lengthy memorandum denying Elizabeth's request for attorney fees and costs. The court concluded Elizabeth was a successful family law practitioner and Thomas was a successful civil litigator and they both had above average earning capacities. The court determined Elizabeth had a greater financial need/hardship than Thomas because her spouse lived on social security and had cancer. The court also noted Elizabeth, being a family law attorney, had expertise in the area of law required by this case. The court recalled Elizabeth "actively represented herself by directing the order of evidence, objecting to questions and responding to objections directed at her. She also testified on her own behalf and cross examined [Thomas]." The court acknowledged McKeon was also present during the case, but it concluded "her role was more as an assistant." The court recalled, "McKeon characterized her role in the case as a 'good friend' and as being present to 'help her as an attorney and counselor at law.'"

16

In a declaration McKeon explained her role was to assure Elizabeth's "'constitutional issues are preserved for appeal, supporting her while she *self represents* . . . .' (Italics added.)" The court agreed with Thomas's contention that if Elizabeth, a certified family law specialist, decided to have an attorney at trial to preserve appellate issues, she should do so at her own expense. The court stated Elizabeth did not need assistant counsel in this case. It noted the legal issues were of moderate difficulty and were primarily of a factual nature. The court also took into consideration the fact Elizabeth was ordered to pay $8,524.88 in sanctions for violating court orders. The court agreed with Thomas that awarding attorney fees would reward Elizabeth for her misconduct and the award would be contrary to the spirit of section 271.

However, the court rejected Thomas's argument attorney fees should not be awarded due to a perceived ethical violation concerning McKeon. It concluded McKeon represented Elizabeth at the same time she was representing Elizabeth's former client, Mrs. Juergens. This dual representation created a conflict of interest because Juergens sued Elizabeth for legal malpractice. The court recognized the conflict of interest but concluded it was not a reason to preclude compensating McKeon for legal services properly performed in this case.

In December 2011, Elizabeth appealed from the court's (1) October 7, 2011, order denying her ex parte request to, inter alia, stop the tentatively ordered double-blind study, (2) the October 11, 2011, decision ordering sanctions, the double-blind study, and modifying legal and physical custody, and (3) the November 17, 2012, order denying her request for attorney fees and costs.

On December 20, 2012, after the appeal was partially briefed, Thomas filed a motion to dismiss and requested sanctions. He explained many of the issues raised in the appeal had been rendered moot because the 30 day double-blind study had been completed. He sought $25,725 in sanctions due to the substantial time he spent defending against a purportedly frivolous appeal.

17

Thomas also filed a motion to strike portions of the opening brief relating to instances Elizabeth had stated facts not supported by the record, and without citation to the record. He also alleged Elizabeth referred to documents that are not part of the record on appeal. Elizabeth opposed these motions, and we informed the parties the matters would be decided in conjunction with the appeal.

Two weeks before the scheduled oral argument date, Elizabeth filed a motion to augment the record with copies of the 730 evaluation and Steinhoff's deposition (the appellant's appendix only contained the parties' respective summaries of his testimony). This court granted the motion over Thomas's opposition, and we gave Thomas an opportunity to file a letter brief regarding any issues raised by the augmented record.

## II

### A. Appeal from the October 7, 2011, Order

A few months after the trial court issued its tentative decision indicating Thomas would be awarded sole legal custody regarding medical decisions and physical custody during the 30 days required for a new double-blind study, Elizabeth filed an ex parte application requesting the order be changed due to emergency circumstances. Elizabeth appeals from the order denying her ex parte application. We need not review her attempt to modify a tentative decision. Any right to interim relief was rendered moot when the court issued its final order and the statement of decision on October 11, 2011, modifying legal custody and ordering a double-blind study. The general rule is that "[a]n appeal should be dismissed as moot when the occurrence of events renders it impossible for the appellate court to grant appellant any effective relief. [Citation.]" (*Cucamongans United For Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479.) In short, the October 11 final order renders it impossible for this court to grant Elizabeth any effective relief from the denial of her ex parte application challenging an interim decision. We dismiss Elizabeth's appeal from the October 7, 2011 interim order.

18

*B. Appeal from the October 11, 2011, Order*

We review only the parts of this final order that have not been rendered moot.[4] To briefly summarize, the court ordered a double-blind study and awarded Thomas sole "decision making authority" related to the study and all other matters relating to his daughter's ADHD assessment. This included selecting the physicians to conduct the study and the participants to report on Alex during the study. Thomas was also given authority to monitor and control any medication found to be medically necessary for ADHD. Thomas had "sole authority to contact the doctors regarding all issues relating or pertaining to the double-blind study, assessment and/or other matters and details regarding any ADHD reassessment or study and/or narcotic or controlled substance . . . ."[5] Moreover, the court gave Thomas the authority to temporarily change the physical custody agreement for the 30-day period during the double-blind study and to select a new pediatrician for Alex. Both parties were prohibited from doing anything to interfere with the study or discouraging Alex from participating in the study. And finally the parties were ordered to share equally in the cost of the study.

As noted in Thomas's motion to dismiss, the orders relating to the implementation of the double-blind study were rendered moot because the double-blind study was successfully completed on March 20, 2012. As noted above, it is impossible

---

[4] Because not all of the appeal was rendered moot by the successful double-blind study, we deny Thomas's motion to dismiss and for sanctions. The appeal is not frivolous or completely moot. Moreover, we also deny his motion to strike the opening brief. While clearly not the model of appellate practice, we have reviewed the briefing and belated augmentation.

[5] In her reply brief, Elizabeth asserts there is no evidence Adderall is a narcotic. Both Thomas and the court referred to it as a narcotic. The Food and Drug Administration has required a black box warning on Adderall, and it contains amphetamines. (http://www.fda.gov/Drugs/DrugSafety/ucm277770.htm)

for this court to give Elizabeth any effective relief on this point.[6]  Similarly, to the extent the court temporarily modified physical custody for the duration of the double-blind study, this issue is also moot because once the study was successfully completed, physical custody was restored to the prior status quo.  In addition, the parties agree Alex has been going to a new pediatrician for over a year, and it appears Elizabeth is not pursuing appellate review of this portion of the court's order.  Elizabeth does not allege this new choice in physicians was erroneous, or that Alex should be returned to Clark's care.  For the reasons stated above, we will not review any of the above listed court orders in this opinion.

However, contrary to Thomas's contention, the entire appeal is not moot. The court's order modifying the legal custody arrangement is an appropriate issue to be reviewed for abuse of discretion.  Child custody orders are modifiable whenever the court finds a change is "necessary or proper" in the child's best interests.  (§§ 3022, 3088.) Family law courts must look at all circumstances bearing on the child's best interests, with the primary focus on the child's health, safety, and welfare.  (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 31-32 (*Burgess*); § 3020.)  There is no preference or presumption in favor of any particular arrangement for custody or visitation.  (§ 3040, subd. (c).)

Custody arrangements under an existing order, such as the case here, can only be changed upon a showing of a substantial change in circumstances so affecting the child that modification is essential to the child's welfare.  (*Burgess, supra,* 13 Cal.4th at p. 37.)  Absent such a showing, any modification constitutes an abuse of discretion.

---

[6]     It appears from the briefing that Elizabeth contends the double-blind study was faulty for several reasons.  She forgets review of the test results is not within the scope of this appeal.  The study took place long after the orders she is appealing from. We have denied her request for judicial notice of the study results because it is not relevant to the issues raised in this appeal.  And in any event, it is not our place to review the scientific method of the study in the first instance.  If Elizabeth feels the study was faulty or defective, her remedy is to seek relief in the trial court.

20

(*Ibid.*)  The moving party has the two-fold burden of showing how circumstances have changed and why the custody modification would be in the child's best interests.  (*In re Marriage of McLoren* (1988) 202 Cal.App.3d 108, 111, 114 [standard applies on requests to change legal custody].)

We review a decision modifying custody under an abuse of discretion standard.  (*Burgess, supra,* 13 Cal.4th at p. 32.)  A greater showing is required to modify a permanent custody order than is required to modify a temporary custody order.  (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 256-257.)

Here, the parties' permanent custody order gave the parents joint legal and physical custody, with primary physical custody to Elizabeth.  Finding a change of circumstances, the court modified the parties' legal custody arrangement, giving Thomas sole legal authority over medical matters relating to Alex's ADHD assessment and treatment.  The court stated it was not going to change any other part of the legal custody arrangement.  Given the record on appeal, we find no abuse of discretion.

As the trial court observed, and the record reflects, Elizabeth showed highly questionable judgment when it came to the issue of medicating Alex for ADHD.  The two experts, Clark and Steinhoff, agreed it would not be in Alex's best interests to be given the wrong dose of Adderall, or worse, medication that was not necessary.  What was brought to light through Clark's and Steinhoff's testimony was the immediate need to determine what, if any, was the correct dosage of Adderall Alex required.  Elizabeth sabotaged UCI's double-blind study by misreporting Alex's current dosage and by insisting Alex must be medicated.  As noted by the judge, "I judge the demeanor of your testimony . . . Quite frankly from this judge's perspective I think you are really committed to the use of this medication."  The court reasonably concluded Elizabeth understood, especially as a family law practitioner, her obligation under an order of joint legal custody to exchange information regarding Alex's medication.  The information she hid from Thomas and UCI reflected a clear bias towards the medicine and a reasonable

21

basis for the court to conclude Elizabeth's bias impaired her ability to make appropriate medical decisions concerning Alex's ADHD diagnosis. There was ample evidence she interfered with the study, the most telling was her misrepresentations to UCI that Alex refused the study's pill when in fact Elizabeth had never taken it out of the study's sealed medicine tray.

It cannot be said the court abused its discretion in finding a change of circumstances regarding Elizabeth's ability to act in her daughter's best interest and this change warranted modifying the legal custody on this limited issue. The court only gave Thomas the final say regarding Alex's diagnosis and treatment of ADHD, not all health care decisions. "Given the trial court's 'very extensive discretion in determining what will be in the best interests of [the] child' [citation], and the demonstrated need to provide an appropriate decision maker for [this minor's particular] medical needs (see *In re Eric B.* (1987) 189 Cal.App.3d 996, 1005-1006), the trial court's order in this respect was proper." (*Cassady v. Signorelli* (1996) 49 Cal.App.4th 55, 62 [court ordered father have sole decision making authority regarding his child's health care decisions in event of disagreements between the parents because mother's ability to make decisions was impaired].) A proper diagnosis regarding ADHD was clearly in Alex's best interest, and Elizabeth demonstrated a bias and impaired decision-making ability with respect to this issue.

Stated another way, the court's order reflects it considered the parents' disagreement over how to approach a medical diagnosis, and based on expert testimony, it reasonably ruled Thomas's approach was in the minor's best interests and must be supported. Because Elizabeth (by her words and actions) demonstrated she was unwilling to cooperate with any future diagnostic studies, the court modified the custody order to insure Alex's best interests would be honored.

We note Elizabeth's briefing fails to address whether the trial court abused its discretion in modifying the legal custody order. Instead, she presents a lengthy legal

discussion suggesting this court must review de novo whether Alex's constitutional rights were violated by the family law court's order. She submits authority to support her legal theory Alex has a constitutional right to medical privacy. She concludes Alex should have the sole decision-making power over the treatment of her mental health. (Citing, § 6924 [minor's right to seek mental health treatment]; *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 397-398 [law requiring pregnant minor to secure parental consent before obtaining abortion violates minor's right to privacy].) Elizabeth does not explain how this body of law applies to a diagnostic test used to determine the correct dosage of a prescription stimulant, or why a minor would have the absolute "right" to ingest any medication without a proper diagnosis. Elizabeth simply concludes the court violated Alex's constitutional rights by placing Thomas in charge of the double-blind study because the study lacked Alex's consent and would be performed over Alex's objection.

The lengthy constitutional rights discussion is interesting but irrelevant because Elizabeth presented no evidence in the trial court to suggest there was a violation of Alex's constitutional rights. Simply stated, there was no evidence to support Elizabeth's claim Alex did not consent to the double-blind study, or that the diagnostic test would be forced over Alex's objection. To the contrary, the evidence showed Alex initially agreed to undergo the first double-blind study in 2009, but it was aborted due to Elizabeth's interference. Alex then agreed to resume the test, but this proved impossible because Elizabeth refused to give Thomas the medicine tray. We have no evidence in this record as to what happened before the second blind study other than the court's representation Alex agreed to the diagnostic test during their private discussion in chambers. As pointed out by Thomas in his briefing, there is nothing in the record suggesting the trial court threatened to punish or hold Alex in contempt if she did not undergo the study.

23

It appears Elizabeth's constitutional argument is based entirely on her own representations of what she thinks her daughter wants. This is an insufficient basis to establish a constitutional violation. Moreover, we have no reason to doubt the trial court's conclusion Elizabeth is not a credible witness. At the hearing, Elizabeth's testimony on several key points was impeached. No sound basis exists for Elizabeth's assertion the court and Thomas are forcing Alex to participate in a diagnostic test without her consent and in violation of her constitutional rights.

Elizabeth also suggests the court's order compelling a double-blind study amounted to a statutory violation under section 6924. That section authorizes a minor, 12 years or older, to obtain, without parental consent, mental health treatment or counseling on an outpatient basis. However, a minor is not authorized to receive convulsive therapy, psychosurgery, or psychotropic drugs without the consent of the minor's parent or guardian. (§ 6924, subd. (f).)

Elizabeth notes only one parent needs to consent to the use of psychotropic drugs, and the statute does not permit one parent to deny drugs over the child's objection. Elizabeth next points out both she and Alex consent to the treatment of her condition with medication. We conclude the section is inapplicable for the simple reason the double-blind study is not a form of treatment or counseling. It is a diagnostic test. The court and Thomas are not unreasonably seeking to deny Alex medication but rather seeking a correct diagnosis required for the proper dosage of medication. We conclude Elizabeth's section 6924 argument provides further support for the court's conclusions about Elizabeth's poor parenting judgment and extreme bias in favor of medicating Alex, warranting a change of legal custody. Her alarming and tenacious commitment to administer psychotropic drugs to a minor, without a proper diagnosis, and after several experts have recommended non-invasive diagnostic testing, is very disconcerting.

24

*C. Appeal from the October 11, 2011, Sanctions Order*

The court ordered Elizabeth to pay $8,524.88 in sanctions (payable in monthly installments of $300) pursuant to section 271. The court noted it reviewed Elizabeth's income and expense declaration and her testimony and it concluded sanctions would not create an unreasonable financial burden on her. The court reasoned "the evidence supports a finding that [Elizabeth] interfered with the double-blind study and therefore engaged in conduct that frustrated the policy of the law to promote settlement and resolution of issues."

Section 271, subdivision (a), provides "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction. In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities. The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed. In order to obtain an award under this section, the party requesting an award of attorney's fees and costs is not required to demonstrate any financial need for the award."

"Sanctions under section 271 are committed to the discretion of the trial court, and will be reversed on appeal only on a showing of abuse of that discretion, that is 'only if, considering all of the evidence viewed more favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order.' [Citations.]" (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1524.)

On appeal, Elizabeth asserts the court abused its discretion by sanctioning her for her daughter's refusal to participate in the double-blind study. She reasons, "It is

25

hard to see what Elizabeth could have done, short of giving up primary custody . . . during the duration of the initial blind study in the first place, in order to assure that Alex would have complied with the protocols of the test." She maintains Alex is old enough to have a strong opinion about issues such as custody, abortions, and birth control pills, and therefore Alex's mother should not be sanctioned simply because Alex adamantly refused to participate in the study. Elizabeth claims she is simply championing her child's right to be the decision-maker in her ADHD treatment. She portrays her actions regarding the double-blind study as not being related to litigation conduct but rather a mother "respecting a mature young teenager's distress and withdraw of her assent to continued use of the placebo."

What Elizabeth is attempting to do on appeal is simply reargue the facts. But our review is limited to whether the court abused its discretion. And this was not a close case. There was ample evidence to support the court's conclusion that but for Elizabeth's conduct there would have been no need for Thomas's OSC seeking a second blind study and a change of legal custody regarding the ADHD diagnosis. Elizabeth exhibited a clear bias against the diagnostic study or any diversion from Alex's medication dosages. Elizabeth sabotaged any chance of the study's success by resuming Alex's Adderall medication after just two days into the study due to the fear a placebo would negatively affect Alex's dance competition weekend. She reported the wrong dosage to UCI and failed to timely advise anyone when she stopped the study. Elizabeth administered and concealed a higher dosage of Adderall before and during the study, and then refused to return the medication tray to Thomas when Alex agreed to restart the study. Elizabeth then withdrew her consent to any future diagnostic studies and continued to see Clark for additional prescriptions of Adderall, knowing he did not have a proper baseline or diagnostic testing to support the dosages. The record is replete with rude and hostile correspondence to Thomas. The court reasonably concluded it was

26

Elizabeth's intentional misconduct and impaired judgment that created additional and unnecessary litigation in this case. The sanction order was not an abuse of discretion.

D. *Appeal from the November 17, 2011, Order Denying Attorney Fees*

"During the pendency of a dissolution action, a court may order that one party pay some or all of the other party's legal fees and costs. (§ 2030 et seq.) "'California's public policy in favor of expeditious and final resolution of marital dissolution actions is best accomplished by providing at the outset of litigation, consistent with the financial circumstances of the parties, a parity between spouses in their ability to obtain effective legal representation.'" [Citation.]" (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 866 (*Keech*).) "It may be a little surprising to some, but the purpose of section 2030 is *not* the redistribution of money from the greater income party to the lesser income party. Its purpose is *parity*: a fair hearing with two sides equally represented. The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength. [Citation.]" (*Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 251-252 (*Alan S.*).)

"[A] motion for attorney fees and costs in a dissolution proceeding is left to the sound discretion of the trial court. [Citations.] In the absence of a clear showing of abuse, its determination will not be disturbed on appeal. [Citations.] '[T]he trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made. [Citations.]' [Citation.]" (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768-769; *Keech, supra,* 75 Cal.App.4th at p. 866.)

However, "[t]he trial court's discretion in this area is . . . limited by the statutes which enable the exercise of that discretion. [¶] Under section 2030, subdivision (a): 'During the pendency of a proceeding for dissolution of marriage . . . , the court may, upon (1) *determining an ability to pay* and (2) consideration of the *respective* incomes and needs of the parties in order to ensure that *each* party has access

27

to legal representation to preserve all of the party's rights, order any party . . . to pay the amount *reasonably necessary* for attorney's fees and for the cost of maintaining or defending the proceeding.' (Italics added.) Under section 2032: '(a) The court may make an award of attorney's fees and costs under [s]ection 2030 . . . where the making of the award, and the amount of the award, are *just and reasonable under the relative circumstances* of the respective parties. [¶] (b) In determining what is just and reasonable under the relative circumstances, the court *shall* take into consideration the need for the award to enable *each* party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in [s]ection 4320 [the factors for determination of "permanent spousal support"] . . . . Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances.' (Italics added.)" (*Keech, supra,* 75 Cal.App.4th at pp. 866-867.)

The trial court's written memorandum reflects consideration of Thomas's ability to pay Elizabeth's legal fees, the respective litigation needs of the parties, and whether the fees incurred were reasonably necessary as required by sections 2030 and 2032. Accordingly, we conclude the court did not abuse its discretion with respect to the fee award.

Turning to the first factor considered by courts in awarding need-based fees, we conclude the court correctly considered the parties' respective *ability to pay.* The court concluded both Thomas and Elizabeth had the ability to pay their own attorney fees, and that Thomas had the ability to pay Elizabeth's fees. This conclusion is well supported by the record. It was undisputed both parties were attorneys with average earning capacities. Elizabeth stated her income was $130,000 per year, but Thomas submitted evidence the figure was closer to 150,000 per year. Thomas reported his income averaged $8,100 a month ($97,200 a year), but Elizabeth focused on six

28

profitable months of reported income and determined his monthly income was closer to $23,000 per month ($276,000 a year).  In addition, both parties had access to other accounts.  Thomas had $135,000 in his accounts, rental income, and real estate assets.  Elizabeth stated she was using her husband's $40,000 savings account to pay bills.  She also received $900 a month in child support.  Elizabeth and Thomas could afford McKeon's $19,704 legal bill.  But that was not the end of the trial court's inquiry, it also must consider the parties' expenses in determining ability to pay.  (*Alan S., supra,* 172 Cal.App.4th at p. 253.)

The parties disputed the amount of expenses that could be attributed to each of them.  Thomas reported he paid over $8,000 in expenses a month.  Elizabeth claimed this number was incorrect and Thomas received support from his girlfriend.  Elizabeth reported she paid over $17,000 in expenses per month.  However, Thomas pointed out why some of Elizabeth's expenses were exaggerated, miscalculated or had been eliminated.  He presented evidence Elizabeth's expenses were more reasonably in the $10,000 range.  We conclude the trial court appropriately considered all the circumstances and reasonably determined Elizabeth had a greater financial hardship than Thomas.  Her expenses were higher, she had lost some earnings while litigating the case, and her current husband lived on social security and was suffering from cancer.

Section 2032, subdivision (b), states "[f]inancial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances."  The award should be based on "the 'big picture' of the case" and "not a truncated process where the trial court simply . . . ascertains which party has the higher nominal income relative to the other." (*Alan S., supra,* 172 Cal.App.4th at p. 254.)  In this case, it appears the court appropriately and heavily relied on these other factors.

For example, the court considered if each side had access to legal representation. The award need only cover the amount *reasonably necessary* to present the case adequately. The court determined Elizabeth more than adequately represented herself and McKeon occupied the limited role of assistant. In other words, McKeon billed attorney fees that were not reasonably necessary for maintaining or defending the proceedings. This ruling is supported by the record.

It is well settled, "An attorney who chooses to represent himself or herself, and does not pay or become liable to pay any sum out of pocket for legal services, may not recover reasonable attorney fees as compensation for the time and effort expended by the attorney and the professional business opportunities lost as a result. [Citation.] An attorney litigating in propria persona does not 'incur' compensation for the attorney's time and lost business opportunities. [Citation.]" (*Mix v. Tumanjan Development Corp.* (2002) 102 Cal.App.4th 1318, 1323 (*Mix*).) Accordingly, Elizabeth, as a self-represented litigant, was not entitled to recover attorney fees for her time litigating the case.

Elizabeth improperly twists the court's ruling to mean the court held she was not entitled to be represented by counsel at the hearing because she was a certified family law specialist. She notes Thomas had an attorney assist him throughout the proceedings, and she too was entitled to "co-counsel." We agree Elizabeth could have hired McKeon to represent her at the hearing and seek fees for those legal services. However, that is not what happened in this case. McKeon did not act as the attorney of record at any time during the hearing. She said and did very little during the proceedings. The record reflects Elizabeth conducted the hearing as a self-represented litigant. She directed the order of evidence, objected to questions, and responded to objections. She testified on her own behalf and made objections to questions while she was on the

30

witness stand. When questioned about her role, McKeon candidly admitted she was a friend "supporting" Elizabeth's self representation.[7]

We recognize there are cases holding pro. per. litigants can recover attorney fees incurred by attorneys retained to assist them on specific parts of the litigation. (See *Mix, supra,* 102 Cal.App.4th at p. 1323.) Moreover, the California Rules of Court, rule 5.425 (hereafter Rule 5.425) specifically recognizes "limited scope representation" in family law cases. A pro. per. litigant may hire an attorney for legal services limited to specific tasks. The representation can be noticed or undisclosed. The rule specifically permits a litigant to seek attorney fees incurred as a result of "document preparation" by undisclosed attorney assistance. (Rule 5.425.)

We find the *Mix* case instructive. There an attorney (Terence Mix) filed an action in propria persona against the landlord of the building where he rented office space. (*Mix, supra,* 102 Cal.App.4th at p. 1321.) This action was consolidated with the landlord's separate action alleging breach of the lease. Under the terms of the lease, the prevailing party in an action was entitled to reasonable attorney fees. Mix retained a law firm to help him "to analyze legal and factual issues, help with trial strategy, and assist [him] in all aspects of the litigation, including trial preparation." (*Ibid.*) One of the attorneys from the firm also assisted Mix during trial, drafting in limine motions, jury

---

[7]        Elizabeth asserts the court showed improper bias when it questioned McKeon about her role in the case. Nonsense. The court questioned McKeon when Elizabeth was on the witness stand and insisted on making her own objections. McKeon advised the court she would not be making objections and she confirmed her limited role in the litigation was as a friend because the litigation was stressful for Elizabeth. Trial courts possess broad power to control their courtrooms and maintain order and security. (Code Civ. Proc., § 128, subd. (a)(1)-(5); *People v. Woodward* (1992) 4 Cal.4th 376, 385.) It would be highly confusing and inappropriate to have both McKeon and Elizabeth simultaneously object to questions while she was a witness. The court's statements about McKeon's limited role in the case were based on how McKeon described *herself* in the courtroom and does not demonstrate bias.

31

instructions, and a special verdict form, and conducting the examination of Mix. The jury found in favor of Mix in both cases and he filed a motion to recover attorney fees owed to the law firm for its assistance, not fees for his own time. The appellate court agreed with the trial court's ruling granting the motion.

The court in *Mix* stated, "An individual who elects to represent himself or herself may also retain counsel to assist in the prosecution or defense of the action. The retained attorney hired to assist a litigant in propria persona has an attorney-client relationship with the litigant and owes the litigant fiduciary and ethical obligations. Such a retained attorney serves the purposes of providing an independent third party's judgment and a means of examination if the litigant is also a witness. 'Legal counsel is just as necessary—perhaps more necessary—for the party who endeavors to represent himself, as it is for the person who has counsel of record. We certainly think it unwise to adopt a policy which would dissuade litigants from retaining attorneys to assist in lawsuits before the attorney appears with respect to filed documents.' . . . If an attorney is in fact retained by the pro se litigant and renders legal services assisting in the lawsuit, the attorney need not be an attorney of record in order for the reasonable fees of the attorney to be awarded to a prevailing party. . . . Moreover, a rule permitting a litigant in propria persona to recover attorney fees for the legal services of assisting attorneys may be applied equally to both attorney and nonattorney pro se litigants." (*Mix, supra,* 102 Cal.App.4th at p. 1324.)

The court concluded, "In this case, Attorney Mix elected to represent himself in the prosecution and defense of the actions on the lease agreement. He is not entitled to nor does he seek compensation for the time he spent litigating the action. However, Attorney Mix retained [independent counsel] to perform legal services in addition to his own services. Attorney Mix incurred and paid compensation to [his counsel] for legal services rendered in connection with the litigation. . . . [¶] There is no

32

authority or reason to require a formal association on the record in order for attorney fees to be recoverable." (*Mix, supra*, 102 Cal.App.4th at pp. 1324–1325.) Thus, the *Mix* case holds a self-represented litigant can retain counsel to assist them. It is important to recognize the court in that case awarded fees under a contract provision, and it did not consider the issue of need-based attorney fees.

In the case before us, the trial court properly recognized Elizabeth, like attorney Mix, elected to represent herself in the prosecution and defense of the OSC, and she was not entitled to compensation for the time spent litigating the action. The court also correctly acknowledged McKeon's limited role in the proceedings as Elizabeth's assistant. In short, Elizabeth hired McKeon to perform legal services *in addition* to her own services. Elizabeth fails to appreciate that while she can retain counsel to assist her with specific legal tasks, her request to recover those supplementary fees under section 2030, on a "needs" basis, requires a determination the *additional* legal representation was *reasonably necessary* for her to adequately maintain or defend the proceedings. (§ 2030, subd. (a)(1).) That issue was not before the court in the *Mix* case where fees were awarded based on a contract provision. Here, the court must consider what is "just and reasonable" under the totality of the circumstances and Thomas's ability to pay is not the exclusive consideration in fixing the amount.

When considering the "reasonable" amount of needs-based fees and costs award, the court must consider the nature and complexity of the litigation, the amount involved, the skill required and employed in handling the litigation, the attention given, the success of counsel's efforts, the respective attorneys' professional standing and reputation, the intricacies and importance of the litigation, the labor and necessity for skilled legal training and ability in trying the case, litigation costs already incurred, and time consumed. (*Keech, supra,* 75 Cal.App.4th at p. 870.)

33

The record shows the court carefully considered these factors. It determined the litigation concerning the OSC was of moderate difficulty. The level of skill required for the litigation was well within Elizabeth's area of expertise, and there were no issues presented at the hearing that required the additional assistance of counsel. McKeon stated her role was as a "back up" attorney, which the court determined was ultimately unnecessary. In addition, the court noted McKeon billed for time unrelated to the hearing, and her efforts at the hearing were overall unsuccessful. For example, McKeon billed for her contribution to constitutional arguments and the applicability for section 6924 during closing arguments, which were rejected by the court. She made a total of 10 objections during the 7-day hearing, the majority of which were overruled. In Elizabeth's declaration supporting her request for fees, she asserted McKeon was hired to assure constitutional issues were preserved for appeal. As aptly stated by Thomas in his briefing, this type of representation goes far beyond ensuring the parties are in a position of relatively equal litigating strength. There is no evidence suggesting Thomas had an attorney present at the hearing to simply observe and preserve appellate issues. It was not an abuse of discretion for the trial court to hold that if Elizabeth, a certified family law specialist, decided to retain counsel to preserve appellate issues, she should certainly do so at her own expense. Under the parity element, Thomas need not pay for Elizabeth's additional legal services that were not reasonably necessary for resolution of the OSC.

The other factor the court considered was that Elizabeth's conduct during the litigation warranted over $8,000 in sanctions. Elizabeth cites to no authority supporting her argument the court should not have considered the sanctions award. In the case, *In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 830, a different panel of this court held attorney fees awarded to wife "must be reduced by the amount of any sanctions awarded" in husband's favor. While not a reason to automatically deny need-based fees, the award of section 271 sanctions is certainly an appropriate factor to consider when determining *the amount* of fees under section 2030.

34

## III

Appellant's appeal of the October 7, 2011 interim order is dismissed. All other orders are affirmed. We deny Respondent's motion to dismiss and to strike the opening brief. We deny Appellant's motion to sanction Respondent for filing a motion to dismiss. Respondent shall recover his costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.

35